UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                    )
LAKE UNION DRYDOCK COMPANY,         )
INC.,                               )
                                    )   No. C05-2146RSL
                  Plaintiff,        )
                                    )   MEMORANDUM OF DECISION
      v.                            )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                  Defendant.        )
_____)

## I. INTRODUCTION

This matter was heard by the Court in a bench trial commencing on September 10, 2007 and concluding on September 18, 2007.  In this maritime contract case, plaintiff Lake Union Drydock Company, Inc. ("LUDC"), a ship repair facility located on Seattle's Lake Union, claims that defendant United States breached the contract for the repair and conversion of the USNS VINDICATOR to a National Oceanic and Atmospheric Administration ("NOAA") research vessel, the R/V HI'IALAKAI. The Court has admiralty jurisdiction in this case under 28 U.S.C. § 1333 and based on the Suits in Admiralty Act, 46 U.S.C. § 30901, et seq. (formerly §§ 741-52), the Public Vessels Act, 44 U.S.C. § 31101, et seq. (formerly §§ 781-90), and the reservation of jurisdiction for maritime contracts in the Contract Disputes Act, 41 U.S.C. § 603. The Court has considered the evidence presented at trial, exhibits admitted into evidence, and the arguments of counsel.  Being fully advised, the Court now makes the following Findings of

MEMORANDUM OF DECISION

Fact and Conclusions of Law:

## II. FINDINGS OF FACT

1. In July of 2003, defendant (hereinafter "NOAA" or the "Government") prepared a solicitation for a contract to repair and convert the VINDICATOR, originally a Navy T-AGOS class vessel that had been in service by the Coast Guard, to a scientific research vessel for NOAA. Ex. 1.

2. LUDC submitted the low bid for the VINDICATOR's conversion and repair. The bid spread of 10% between the four bidders was "very close" and the second lowest bid was within 2% of LUDC's bid. Ex. 26, 27. On September 19, 2003, at the Government's request, LUDC confirmed its bid amount. Ex. 504. On September 30, 2003, the Government awarded the VINDICATOR contract (hereinafter the "Contract") to LUDC in the amount of $4,069,417.00. Ex. 2.

3. On October 1, 2003, work commenced in accordance with the Notice to Proceed and was scheduled to be completed by January 18, 2004. Ex. 11. Ultimately, the completion date was extended to February 20, 2004. Ex. 6 (Contract Modification 6). The VINDICATOR was returned to NOAA's pier, which is adjacent to LUDC's pier on Lake Union, on March 4, 2004. The project was finally completed at NOAA's pier on March 18, 2004. Ex. 13. The Government paid LUDC a total of $3,994,410.00 for its performance under the Contract. Ex. 6 (Contract Modification 8).

4. LUDC's President, George Nielson, testified that after the project was completed, LUDC examined its financial returns on a job-wide basis and discovered that LUDC had incurred a direct loss on the project in excess of $1.1 million, excluding profits. To determine what caused the shortfall, LUDC met with its craft foremen and job superintendents. Based on this information, LUDC decided to "put together a claim."

5. On October 11, 2004, LUDC submitted a certified claim for $526,450 to NOAA's Contracting Officer, Paul Reed. Ex. 12 (hereinafter "certified claim"). The certified claim

identifies 8 Government actions justifying LUDC's claimed amount:

> 1. DRAWINGS:  Government provided conversion drawings that either did not properly depict the actual arrangement of the vessel or depicted an impractical method of installation.
>
> 2. LACK OF CHIEF ENGINEER:  Lack of either a full time or on call vessel engineer that would be familiar with the arrangement and location of the ship's systems.
>
> 3. LATE RESPONSE TO CONDITION PROBLEM REPORTS (CPR)
>
> 4. REJECTION OF ESTIMATED COSTS:  Rejection of "job study" and other appropriate labor costs in negotiated change orders for new work.
>
> 5. DIRECTED WORK OUTSIDE THE JOB SCOPE
>
> 6. EXTENDED PERIOD OF PERFORMANCE (due to the above listed issues).
>
> 7. EXCESS FUEL ABOARD VESSEL
>
> 8. GLOBAL DISRUPTION ON THE PROJECT (relating to the above listed issues).

Id. at 1-2.

6. On December 10, 2004, in response to the certified claim, the Contracting Officer requested additional information from LUDC by February 15, 2005. Ex. 32. On February 15, 2005, LUDC provided the additional information in a letter clarifying the certified claim, where LUDC conceded that it was responsible for some portion of the cost overrun but contended that its claimed amount was still appropriate because LUDC's total loss had been reduced by 9,100 hours to account for its fault:

> LUDC does not suggest that its performance was without flaws on the Vindicator project and LUDC has thoroughly analyzed the factual development of the project and the respective performance of LUDC and NOAA. This analysis has demonstrated that the causation of increased costs and schedule delay on the Vindicator was principally due to NOAA actions at variance to the contract. The LUDC responsibility is more than compensated by the 9,100 man hours of effort expended by LUDC and not being claimed by LUDC.  This equates to 25% variance of LUDC effort against its compensation.

Ex. 15 at 7.

7. In response to the additional information, on October 5, 2007, the Contracting Officer issued a final decision and denied all of the certified claim, with the exception of item 6,

MEMORANDUM OF DECISION                -3-

"Directed Work Outside the Job Scope," for which the Government agreed to compensate LUDC $6,210.[1]  Ex. 13.

8.  As a result, LUDC filed this action on December 25, 2005.  LUDC claimed at trial that the same Government actions identified in the certified claim caused LUDC's damages.  Dkt. #34 (Plaintiff's Trial Brief) at 34.  For clarity, the Court organizes the findings below based on these issues.

**A.     Adequacy of the Drawings & Specifications**

9.  At trial, Gary Decker, who helped prepare the certified claim for LUDC, testified that he expected the drawing package to be "perfect."  LUDC's own naval architecture expert Stanley Stumbo, a registered professional engineer and the former chief naval architect for the Washington State Ferry System, however, conceded that he has "never seen a perfect set of conversion drawings."  Mr. Stumbo also testified that the overall drawing package in this case was "good" and generally of high quality with no more than the usual number of errors.  In Mr. Stumbo's words, there were "no show stoppers."  The Court finds that the Government's drawings and specifications were reasonably accurate and workable.

10.  The Court also finds that LUDC did not prove that deficiencies with the repair and conversion drawings caused the damages claimed.  Mr. Decker testified that he prepared the certified claim by conducting interviews with the project craft foremen.  With respect to the drawings, Mr. Decker stated that during the interviews with the foremen they identified

---

[1] In its Complaint, LUDC alleges that "NOAA stated that it would compensate LUDC in one instance for work it directed LUDC to perform outside the job scope, even though to the date of this Complaint, NOAA has failed to pay the amount due for this work." Dkt. #1 at ¶3.17.  On January 11, 2006, the Contracting Officer agreed to pay the $6,210 on this item upon receipt of an invoice.  Ex. 38 ("Please submit an invoice requesting payment in the amount of $6,210 to the attention of COTR Tim Trembley . . . and NOAA will process the invoice for payment.").  In its trial brief, LUDC did not assert that it was entitled to recovery for the work identified in item 6 of the certified claim.  For all these reasons, the Court finds that the portion of LUDC's claim relating to item 6 of the certified claim, "Directed Work Outside the Job Scope," has been resolved pending LUDC's submission of the requested invoice.

MEMORANDUM OF DECISION                    -4-

1  problems with the drawings and then after these interviews, and in preparation for the claim,
2  LUDC found that there were drawings that were not coordinated with one another.  Despite the
3  fact that LUDC based its certified claim on interviews with the foreman, in its case-in-chief,
4  LUDC presented testimony from only one craft foreman, Tom Hooper, the foreman of LUDC's
5  sheet metal shop.  On cross-examination, however, Mr. Hooper testified that he had not been
6  interviewed about the issues in the claim until this year.  Based on the factors identified in 9th
7  Circuit Jury Instruction 3.6, the Court finds that LUDC's claim that drawing errors caused its
8  damages in this case is not supported by credible evidence.

9        11.  Section H.4.(i) of the Contract states: "The Government does not guarantee the
10 correctness of the dimensions, sizes, and shapes given in any sketches, drawings, plans or
11 specifications prepared or furnished by the Government.  The Contractor shall be responsible for
12 the correctness of the shape, sizes and dimensions of parts to be furnished hereunder, other than
13 those furnished by the Government."  The Court finds that this provision does not affect the
14 disposition of the case because it is a general disclaimer and does not relieve the Government of
15 its obligation to provide adequate drawings and specifications.

16 **B.      Lack of a Chief Engineer**

17       12.  In its certified claim, LUDC stated that the "Vindicator did not have a Chief
18 Engineer assigned to it during the conversion, as was reasonably anticipated and generally
19 suggested in the contract specifications."  Ex. 12 at 4.  Detailed Specification Item 103,
20 "Propeller Shaft, Shaft Seals & Bearing Inspections" states in paragraph 4.2.2.3:  "Obtain the
21 weardown gage from the <u>ships [sic] engineer</u> (Item 16) and measure and record intermediate
22 bearing weardown both top and bottom.  If the weardown gage is not available it is within the
23 scope of this item to fabricate an adapter which fits in the weardown plug hole so that a depth
24 micrometer may be used to take weardown readings."  Ex. 4 at 10 (emphasis added).  Detailed
25 Specification Item 101 requires that LUDC "[p]rovide COTR / Ships [sic] Officer parking for
26 four vehicles within the contractors [sic] facility," in addition to "at least 200 square foot office

1 space for the ship's command," and "covered, dry, secure (lockable) temporary storage area for
2 the ship's crew." Id. at 3-4.

13. Mr. Nielson testified that based on these specifications LUDC assumed that the Government was providing a full-time chief vessel engineer for the project. The Court finds, however, that this assumption is unreasonable and does not make sense in light of the other contract provisions, including section M of the Solicitation, which states: "The <u>vessel is currently inactive and has no crew</u>, however <u>the Government intends to crew the vessel prior to the conclusion of the conversion period</u>." Ex. 2 at 62 (emphasis added). The Court finds that this clause is unambiguous and LUDC did not submit any questions under section L of the Solicitation to clarify the Government's staffing of the vessel during the project.

14. The presence of a full-time vessel engineer is not necessary to give effect to the provisions cited by LUDC as requiring this position. At times during the project the Government did staff the project with a vessel engineer, Sara Greene, which means that at times there was a ship's engineer from whom the wear-down gage could have been obtained. And, had the project been completed during the time the vessel was at LUDC's pier, the newly commissioned crew would have needed the office and parking space provided for in the Contract.

15. The Court also finds that LUDC failed to carry its burden to show that its damages were caused by a lack of a full-time chief vessel engineer. The Contracting Officer credibly testified that in negotiations between LUDC and the Government during the project, LUDC never raised the issue of the absence of a full-time chief engineer nor did LUDC submit a Condition Problem Report for this item. Furthermore, this claim is purportedly founded on interviews with the craft foreman, but the one foreman who testified stated that he had not been interviewed until this year.

**C. Response time to Condition Problem Reports**

16. In its certified claim, LUDC stated: "[b]eyond additional costs relating to servicing

the contract without benefit of information and assistance normally provided by a chief engineer, LUDC incurred significant expense servicing inefficiencies caused by untimely response to Condition Found Reports (CPRs)." Ex. 12 at 6.  LUDC contends that the Government breached the contract by failing to respond to CPRs "within approximately two days."  Dkt. #34 (Trial Brief) at 24.

17.  The Court finds that the Contract is silent on the definition of a CPR and the procedure and timing of a CPR response.  The only relevant Contract provision setting a time for a Government response states that "[d]ocumentation, including drawings and other engineering products and reports, required by the contract to be submitted for review, comment, acceptance or approval will be acted upon by the Government within 30 calendar days after receipt by the Government, unless another period of time is specified."  Ex. 2 at section H.15(a) (emphasis added).

18.  Table 4 of the certified claim establishes LUDC's support for the portion of the claim relating to late CPR responses.  The Government's expert Everett Harry credibly established, however, that over half of the line-items in this table have some type of discrepancy.  The Contracting Officer's Technical Representative ("COTR"), Tim Trembley, also credibly testified that by taking into account the CPRs where LUDC did not indicate a requested response date, duplicate CPRs, and weekend dates, the COTR responded to the CPRs in an average of 3 days.  The Court finds that this was a reasonable response time and accordingly, finds that LUDC's expectation that the Government respond within approximately 2 days was unreasonable and was not contractually required.

**D.    Rejection of Estimated Costs**

19.  The Contract contemplated that the Government would add additional scope to the project. Section H.29 "Additional Government Requirements" of the Contract states that: "(a) This clause applies to growth and new work items.  The Contractor shall be able to perform work items so as to permit up to 10,000 man-hours of work to be performed as 'additional

MEMORANDUM OF DECISION                          -7-

Government requirements' during the contract period of performance, without causing delay or disruption to the work performance under this contract . . . and without giving rise to any claim for an equitable adjustment to supplement the price specified in paragraph (e) below." Section H.29(e) provides that "[r]equirements ordered pursuant to this clause will be priced using the man-hour reservation rate specified in Section B, pricing item 201" and section H.29(h) further provides that the "Contractor shall not be entitled to payment for any hours awarded under Item 201, until such hours are ordered through a written contract modification." Ex. 2. Under section H.29(b), the 10,000 hours are defined as "production man-hours" for activities such as welding, pipe fitting, and boilermaking. Id.

20. As part of its bid, LUDC agreed to a $50/hour rate for the 10,000 production man-hour reservation in Item 201. Id. at 3. Under section H.29(b), this $50 rate was to be "the burdened rate for production man-hours," meaning that rate included necessary support functions that otherwise would not be allowed as part of the 10,000 hour reservation. Necessary support functions expressly incorporated in the burdened rate include activities like "Fire watch," planning, and supervision. The Court finds that section H.29 of the Contract is unambiguous.

21. As part of change order requests, LUDC submitted hours for activities qualifying as support functions in Item 201's 10,000 hour reservation, and these hours were rejected by the Government. The Court finds that the Government's rejection of these costs was justified. When LUDC bid this project, it agreed be bound by a $50 rate under Item 201, which was to be a rate burdened by non-recoverable support functions. Allowing LUDC to claim support function hours within the 10,000 hour reservation would mean that LUDC failed to include a properly burdened rate in its bid. As the Contracting Officer testified, allowing support function hours within the 10,000 hour reservation would be inequitable to the other bidders who included a properly burdened rate in their bids.

22. Based on credible testimony from the Contracting Officer and Edward Rockenstire,

MEMORANDUM OF DECISION                -8-

the Contracting Officer's supervisor, the Court also finds that there was no agreement by the Government in a November 2003 meeting, or otherwise, to waive the express requirements in section H.29.

**E.   Extended Period of Performance**

23.   In its certified claim, LUDC contends that it is owed $2100/day for the nine days it alleges that the VINDICATOR remained at LUDC's pier beyond agreed upon extensions.  Ex. 12 at Table 1.  This claim is based on LUDC's assertion, discussed in Section II.B above, that the Government failed to timely respond to CPRs.  Ex. 12 ("It is LUDC's claim that the performance period extended beyond the contractual date because of the government's failure to respond promptly and accurately to the contractor's request for information."); Dkt. #34 (Plaintiff's Trial Brief) ("NOAA's failure to timely respond to CPRs, and to authorize the change work, caused well over nine days delay on several critical path items.").

24.   As the Court found above, the Government did not fail to timely respond to LUDC's CPRs and requests for information, and therefore the Court also finds that the Government is not responsible for the claimed 9-day delay.  LUDC also has failed to prove that the items of delay were on the critical path.[2]  Furthermore, LUDC conceded in its February 15, 2005 clarification letter that it was responsible for project delay, but it failed to present proof of clear

---

[2] At times, LUDC confused the scheduling methodology required for this Contract.  The Contract expressly states in section H.29 that the Production Schedule "shall identify the critical path."  Ex. 2.  Testimony from Jeff VanGaver, LUDC's contract administrator, and Hobbie Stebbins, LUDC's VP of Production and Sales, coupled with LUDC's trial brief, however, indicates that LUDC was at times scheduling this project using bar-chart or "Gantt" chart scheduling instead of the critical path method. Dkt. #34 (Trial Brief) (stating that "LUD[C] also submitted . . . the first production schedule, a critical path schedule (or Gantt chart) which identifies work that if delayed will impact the scheduled completion date.") (emphasis added); Richard F. Smith, Scheduling for a Construction Project, in Fundamentals of Construction Law, 201, 205 (Carina Y. Enhada et al. eds., 2001) ("On smaller projects, a frequently used, inexpensive method is the bar chart or 'Gantt' chart . . .[, but] a bar chart inadequately describes whether a delay to a particular activity will affect other activities or the ultimate project completion date. . . .  As a result, most large construction projects will use the Critical Path Method ('CPM').") (emphasis added).

MEMORANDUM OF DECISION                    -9-

apportionment of the delay and expense attributable to each party.

**F.     Excess Fuel**

25.   In its certified claim, LUDC asserted it was entitled to additional compensation because "[t]he disruptive impact of storing fuel aboard beyond the original 42,000 gallons planned for was not anticipated when pricing CO [Change Order] 47A." Change Order 47A, in the amount of $39,542, was incorporated into the Contract by Modification 7. Ex. 6, 526. Modification 7 was signed by LUDC on April 6, 2004, <u>after</u> the project was complete. <u>Id.</u> Given this late date, LUDC had adequate time in which to calculate and include all costs associated with the excess fuel into the Contract modification. Modification 7 also contains a release stating: "In consideration of the modification agreed to herein as complete equitable adjustments for the change orders incorporated, the Contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposal for adjustment." <u>Id.</u> LUDC did not seek to reserve its rights on the amount of the adjustment for the fuel transfer, nor does the Court find credible the testimony from Mr. VanGaver that the Government waived enforcement of this provision.

26.   LUDC's agreement to a post-completion modification releasing the Government for future claims based on the excess fuel supports the evidence at trial showing that this differing condition did not cause LUDC damage beyond the $39,542 already claimed and received under Change Order 47A and Modification 7.

**G.     Global Disruption on the Project**

27.   At trial, Mr. Nielson testified that LUDC recognized the "uniqueness" of section H.29 of the Contract requiring 10,000 hours of indefinite work. LUDC estimated that the defined work would take approximately 28,000 hours during a short 14-week time frame. Mr. Neilson also acknowledged that including 10,000 hours of unspecified work on a 14-week project effectively meant that constructive planning could not be done in advance. LUDC had

MEMORANDUM OF DECISION                     -10-

this information, and despite these considerations, bid on the work.

28. In its certified claim, Ex. 12 at 11 and Table 6, and at trial, LUDC claimed that it was damaged by "global disruption" on the project because the Government exceeded the 10,000 hour reservation, and the allocation of the hours during the project violated section H.29(g), which states:

> The additional Government requirements for production man-hours under item 201, if needed, shall be ordered during the contract period of performance, as may be modified on the following schedule:
>
>   1. No more than 75% of the hours during the first half of the contract period of performance.
>   2. No more than 50% of the hours during the third quarter of the contract period of performance.
>   3. No more than 30% of the hours during the fourth quarter of the contract period of performance.

29. The Court finds, however, that LUDC's contention that the Government exceeded the 10,000 hour reservation and breached section H.29(g) is not supported by credible evidence. As contract Modifications 2-7 show, the hours applied by LUDC against Item 201 in the Contract do not exceed 10,000 hours. LUDC's certified claim also shows that less than 8,500 hours were applied by LUDC to Item 201. See Ex. 12 at Table 6 (showing 8,127 LUDC hours); Ex. 15 at Table 6 (revised) (showing 8,379 LUDC hours). Although LUDC contends that when "subcontractor growth hours" are considered the 10,000 hour reservation was exceeded by 685 hours, LUDC failed to provide proof that the subcontractor growth hours were actually incurred and were properly charged to Item 201. See Ex. 15 Table 6. None of LUDC's subcontractors testified at trial and LUDC has failed to meet its burden to show that the 10,000 hour reservation was exceeded. LUDC also has failed to prove that the permitted allocation of the 10,000 hours under section H.29(g) was exceeded because this contention is also based on the inclusion of "subcontractor growth hours," which have not been established. Finally, by agreeing to Modifications 2-7, LUDC expressly released the Government from liability for further equitable adjustment. Ex. 6.

30. LUDC also has not proven that it correctly allocated the hours identified in Table 6 of the certified claim to section H.29(g)'s requirements. LUDC used the contract modification dates to apply the hours incurred for Item 201 work to section H.29(g). Section H.29(g), however, provides that the allocation is to be based when the hours are "ordered" not on when the modification is signed.[3]

31. Finally, the Court finds that LUDC has not shown that "the number of changes, lack of a ship's engineer, and drawing deficiencies combined to cause cumulative delay and disruption damages." Dkt. #34 at 26. As the Court found above, LUDC has not met its burden to show that the lack of a full-time chief engineer and drawing deficiencies caused damage in this case. Furthermore, the Court finds that there was not an excessive number of changes because of the expectation under section H.29 that the Government could add 10,000 hours of new work items. The Government did not exceed Item 201's 10,000 hour reservation and therefore the Court finds that the Government did not act beyond the scope of the Contract.

32. Based on the evidence presented at trial, the Court finds that the difficulties experienced by LUDC in this case are in large part attributable to LUDC's failure to appropriately track the project through the contractually required critical path method and updated CPM schedules.[4]

---

[3] For example in Table 6 of the certified claim, all of the 552 hours for the fuel transfer, as allowed by Change Order 47A, are allocated to the fourth quarter of the contract period because they were included in Modification 7, which was signed on April 4, 2004. Ex. 12. But, testimony at trial established that the hours incurred for the fuel transfer activity were actually expended relatively early, not at the very end of the project.

[4] See supra note 2; Ex. 2, section H.32 ("The Contractor shall provide the Contracting Officer and COTR with the following documents within (5) workdays of the ship's arrival at the Contractor's facility: a. Production Schedule . . . The Production Schedule shall list the earliest, latest and scheduled start and completion date for each work item awarded and shall identify the critical path. Change Order schedules shall be added to the Production Schedule . . . and submitted to the Contracting Officer and COTR at each weekly Progress Meeting."); Ex. 505 (Deficiency Report).

MEMORANDUM OF DECISION                    -12-

### III.  CONCLUSIONS OF LAW

**A.     Jurisdiction**

1. This is a maritime contract action. See Norfolk S. R.R. Co. v. Kirby, 543 U.S. 14, 23-4 (2004). "It is undisputed that contracts for the repair of United States government ships are governed by the provisions of the Suits in Admiralty Act [46 U.S.C. § 30901, et seq. (formerly §§ 741-52)], and are entrusted, as marine contract actions, to the admiralty jurisdiction of the United States district courts. At the same time, all government contracts are subject of the Contract Disputes Act of 1978 ["CDA"], 41 U.S.C. §§ 601-613." Bethlehem Steel Corp. v. Avondale Shipyards, Inc., 951 F.2d 92, 93 (5th Cir. 1992) (internal citation omitted). There is a special provision in § 603 of the CDA for maritime contracts. "[S]ection 603, rather than completely excluding maritime contracts from the [CDA], simply vests appeals from the administrative determination of claims in the district courts, rather than in the Court of Claims or the Court of Appeals for the Federal Circuit." Id. at 94. The submission of a certified claim to the contracting officer is a prerequisite to the district court's subject matter jurisdiction over claims arising out of maritime contracts brought under the CDA. Id. at 94-95; Southwest Marines, Inc. v. United States, 926 F. Supp. 142, 145 (N.D. Cal. 1995).

2. In this case, there is no dispute that the Court has jurisdiction over this matter and the LUDC submitted a certified claim to the Contracting Officer. The Government, however, contends that the Court does not have jurisdiction over LUDC's damages that exceed the $526,450 amount in LUDC's certified claim because this increased amount was not certified and submitted to the Contracting Officer. See Dkt. #31 at 7. LUDC contends, however, that certification is not necessary for breach of contract claims like breach for cardinal change, citing Air-A-Plane Corp. v. United States, 408 F.2d 1030 (Ct. Cl. 1969). LUDC's reliance on this pre-

CDA case for jurisdictional purposes is misplaced.[5]  But, because the Court has found that the claims presented in this case are the same as those presented to the Contracting Officer, the monetary relief sought in this case above the $526,450 in the certified claim did not need to be presented to the Contracting Officer and recertified.[6]  See Tecom, Inc. v. United States, 732 F.2d 935, 938 (Fed. Cir. 1984) ("[T]he general principle [is] that a monetary claim properly considered by the contracting officer . . . need not be certified or recertified if that very same claim (but in an increased amount reasonably based on further information) comes before a board of contract appeals or a court.") (emphasis in original).

**B.    Breach of Contract**

3.  "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." Franconia Assocs. v. United States, 536 U.S. 129, 141 (2002) (internal quotation marks omitted). Accordingly, the Court here applies "principles of general contract law." Id.  Interpreting a contract starts with the "plain meaning" of the agreement. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996).  A court will "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to alternative meaning." Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998).  Contract interpretation must be undertaken "in a manner that gives meaning to all of its provisions and

---

[5] See, e.g., Justin Sweet, The Amelco Case: California Bars Abandonment Claims in Public Contracts, 32 Pub. Cont. L.J. 285 (2003) ("Originally, the [cardinal change] concept had a jurisdictional function. . . . To get to a court . . . the claimant had to show that there had been a breach of contract.  To support its claim of a breach, the claimant would contend that there had been many more changes ordered than could have been expected or, less commonly, that the scope of the change had exceeded the power granted to order changes. The Federal Contract Disputes Act of 1978 eliminated the jurisdictional problem.  This gave the claimant a choice.  It might go to the U.S. Claims Court or to an agency board of contract appeals.") (emphasis added).

[6] This legal issue, however, is not dispositive here because of the Court's conclusion below that LUDC is not entitled to recover any damages in this case.

MEMORANDUM OF DECISION                 -14-

makes sense." McAbee, 97 F.3d at 1435.  While "ambiguities in contracts drawn by the Government are construed against the drafter," terms are ambiguous only if they are "susceptible to more than one reasonable interpretation."  Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 973 (Ct. Cl. 1965); McAbee, 97 F.3d at 1435.  Based on this authority, and the findings set forth above, the Court concludes that the Government did not breach the contract as claimed by LUDC by:  (1) providing inadequate drawings and specifications, (2) failing to provide a full-time engineer,[7] (3) failing to provide timely responses to CPRs, (4) rejecting estimated costs under Contract section H.29, (5) failing to compensate LUDC for the additional time the Vindicator remained at LUDC's pier, (6) failing to compensate LUDC for disruptions caused by excess fuel, and (7) globally disrupting the project.

**C.     Causation**

4.  "Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach. 'The costs must be tied in to fault on defendant's part.'"  Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970) (quoting River Constr. Corp. v. United States, 159 Cl. Ct. 254, 270 (1962).  In the context of delay damages, "[t]he general rule is that where both parties contribute to the delay neither party can recover damages unless there is in the proof a clear apportionment of the delay and expense attributable to each party."  William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984) (internal quotation marks and citation omitted). Based on the Court's findings above, LUDC failed to prove by a preponderance that its claimed

---

[7] LUDC has failed to show as a matter of law that the failure to provide the bridge log in this case entitles LUDC to the presumption that a knowledgeable ship's engineer was available and that this engineer was required to be on-board and available for the contract period.  Dkt. #34 (Plaintiff's Trial Brief) at 25-26.

MEMORANDUM OF DECISION           -15-

damages were caused by a Government breach.[8]

**D.     Implied Warranty**

5. "In the world of government contracts, a jurisprudential difference exists between what are known as 'design specifications' and 'performance specifications.'" Travelers Cas. and Sur, of Am. v. United States, 74 Fed. Cl. 75, 89 (2006) (citing John Cibinic, Jr. et al., Administration of Government Contracts 276-86 (4th ed. 2006)).  A performance specification lays out the "objective without specifying the method of obtaining the objective." White v. Edsall Constr. Co., Inc., 296 F.3d 1081, 1084 (Fed. Cir. 2002).  In contrast, "[d]esign specifications . . . describe in precise detail the materials to be employed and the manner in which the work is to be performed.  The contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.'" Blake Constr. Co. v. United States, 987 F.2d 743, 745 (Fed. Cir. 1993) (quoting J.L. Simmons Co. v. United States, 412 F.2d 1360, 1362 (Ct. Cl. 1969)).  Whether a contract is a design or performance specification is a mixed question of fact and law. Travelers Cas. and Sur. of Am., 74 Fed. Cl. at 86.  "[D]etailed measurements, tolerances, materials, i.e., elaborate instructions on how to perform the contract" together may constitute a design specification. Stuyvesant Dredging Co. v. United States, 11 Cl. Ct. 853, 860 (1987).  Based on this authority and the Court's findings above, the Court concludes that the Contract in this case is a design specification contract.

---

[8] At trial, the use of the 1982 NAVSEA Guidelines on Factors Influencing Cost for Forward Pricing Change Order Disruption, Delay, Acceleration and Cumulative Effects (the "NAVSEA Guidelines") as a means of calculating global disruption damages in this case was hotly contested. See Ex. 15.  Because the Court has concluded that the Government did not breach the Contract as LUDC contends, and LUDC has not proven causation, the Court does not need to reach the merits of whether the use of the NAVSEA Guidelines is an appropriate methodology to prove damages in this type of case.  The NAVSEA guidelines, similar to other global approaches like the total cost method, are only a means of calculating damages.  In a breach of contract case, breach and causation must be established. See, e.g., Bernhard A. Aaen, The Total Cost Method of Calculating Damages In Construction Cases, 22 Pac. L.J. 1185, 1190-91 ("The total cost method is not a substitute for proof of causation but rather a method for calculating the amount damages.  The total cost method has validity as a technique for calculating the amount of damages only after establishing the legal obligation to pay damages.").

MEMORANDUM OF DECISION                          -16-

6. In a design specification contract there is an implied warranty that "satisfactory contract performance will result from adherence to the specifications." Franklin Pavkov Constr. Co. v. Roche, 279 F.3d 989, 995 (Fed. Cir. 2002). This implied warranty flows from the Supreme Court's decision in United States v. Spearin, 248 U.S. 132 (1918), where the Court explained:

> [I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the ususal clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work[.]

Id. at 136 (internal citations omitted).

7. Under this implied warranty, "general disclaimers requiring the contractor to check plans and determine project requirements do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications." White, 296 F.3d at 1085 (Fed. Cir. 2002) (citing Al Johnson Constr. Co. v. United States, 854 F.2d 467, 468 (Fed. Cir. 1988) ("The implied warranty is not overcome by the customary self-protective clauses the government inserts in its contracts[.]"). "Only express and specific disclaimers suffice to overcome the implied warranty that accompanies design specifications." Id. Based on this authority and the findings above, the Court concludes that Contract section H.4.(i) does not negate the implied warranty. Even with an implied warranty, however, a contractor must still prove "that the warranty was breached and that [its] damages were caused by the breach." Hercules Inc. v. United States, 24 F.3d 188, 198 (Fed. Cir. 1994). The Court concludes that LUDC did not meet its burden on either of these requirements.

8. First, although design specifications are intended to provide a contractor with a detailed guide on how to complete a project, they "need not be paragons of perfection" but must simply be "reasonably accurate." Travelers Cas. and Sur. of Am., 74 Fed. Cl. at 89 (citations omitted). A defective specification or drawing is one that is "so faulty as to prevent or unreasonably delay completion of the contract performance." Wunderlich Contracting Co. v.

United States, 351 F.2d 956, 964 (Ct. Cl. 1965).  The government's documents must be "substantially deficient or unworkable" in order to be considered a breach of the contract.  Id.

9.  Here, based on the Court's findings and the testimony from LUDC's expert Stanley Stumbo, the Court concludes that the Government did not breach the implied warranty that the drawings and specifications are free from design defects.  Furthermore, most of the design errors identified by LUDC were situations where there was a patent mistake in the conversion drawings, and in these circumstances, LUDC had a duty to inquire about the drawing conflict before proceeding.  See White, 296 F.3d 1085 ("The implied warranty . . . does not eliminate the contractor's duty to investigate or inquire about a patent ambiguity, inconsistency, or mistake when the contractor recognized or should have recognized an error in the specifications or drawings.").  Additionally, even to the extent that there were design errors, LUDC failed to prove that these errors caused its claimed damages.  The fact that the four bids were close also supports the conclusion that the bid package was sufficiently complete.

**E.     Cardinal Change**

10.  "[A] cardinal change is a breach.  It occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different than those originally bargained for.  By definition, then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach."  Allied Materials & Equip. Co., Inc. v. United States, 569 F.2d 562, 563 (Ct. Cl. 1978).  "A cardinal change can occur even when there is no change in the final product because 'it is the entire undertaking of the contractor, rather than the product, to which we look.'"  Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1332 (Fed. Cir. 2003) (quoting Edwin R. Marden Corp. v. United States, 442 F.2d 364, 370 (Ct. Cl. 1971).  "The finding of cardinal change is 'principally a question of fact.'"  Id. (quoting Allied Materials, 569 F.2d at 565).  "There is no exact formula for determining the point at which a single change or a series of changes must be considered to go beyond the scope of the contract and necessarily in breach of it.  Each case must be analyzed

on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." Wunderlich, 351 F.2d at 966.

11. Based on this authority, and the findings set forth above, the Court concludes that there was no cardinal change. The changes that occurred in this case were redressable under section H.20 of the Contract. Section H.29 also expressly states that there will be growth and new work and the Government did not exceed its reservation for this work.

**F.     Unjust Enrichment**

12. LUDC's claim for "unjust enrichment" is mis-named. See Dkt. #1 (Complaint) at 9 ("Claim for Breach of Contract – Unjust Enrichment").[9] "[T]he proper cause of action is restitution; unjust enrichment is an element of a claim for restitution not an independent cause of action." Morse Diesel Int'l, Inc. v. United States, 66 Fed. Cl. 788, 794 n.5 (Cl. Ct. 2005) (citing Restatement of Restitution § 1 (1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other."). "To succeed on a claim of restitution based on a theory of unjust enrichment, [plaintiff] must establish the following elements: (1) a benefit conferred on the [defendant] by the [plaintiff]; (2) an appreciation or knowledge by the [defendant] of the benefit; and (3) the acceptance or retention by the [defendant] of the benefit under such circumstances as to make it inequitable for the [defendant]

---

[9] In its trial brief, LUDC further confuses this claim by asserting that it is based on the equitable doctrine of quantum meruit. See Dkt. #34 at 33. Recovery in quantum meruit is dependant on a contract either implied-in-law or implied-in-fact. Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1326-27 (Fed. Cir. 2007). "An implied-in-fact contract is an agreement founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding. By comparison, an implied-in-law contract is a fiction of law where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403, 407 (Fed. Cir. 1996) (internal citations and quotation marks omitted). At trial, LUDC did not present evidence supporting recovery based on an implied contract justifying recovery in quantum meruit.

MEMORANDUM OF DECISION                    -19-

to retain the benefit without payment of its value." Int'l Air Response v. United States, 75 Fed. Cl. 604, 612 (Cl. Ct. 2007) (internal quotation marks omitted).  In this case, based on the Court's findings above, the Government compensated LUDC for benefits received and therefore LUDC is not entitled to recovery based on a theory of unjust enrichment.

## IV.  CONCLUSION

Based on the findings recited above and the Court's conclusions of law, the Court finds in favor of defendant on all of plaintiff's claims for breach of implied warranty, breach of contract for cumulative delay and disruption, cardinal change, and unjust enrichment.  The Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

DATED this 10th day of October, 2007.

                                                  *Robert S. Lasnik* (signature)
Robert S. Lasnik
United States District Judge